IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANIE POLASTRE-JACKSON,
*Plaintiff*,

v.

Civil Action No. ELH-17-228

ACTING COMMISSIONER CAROLYN W.
COLVIN,
*Defendant*.

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Anie Polastre-Jackson filed suit against

Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration ("SSA"),

alleging race discrimination, in violation of Title VII of the Civil Rights Act of 1964, codified, as

amended, at 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") (Count I); sex discrimination, in violation

of Title VII (Count II)[1]; retaliation, in violation of Title VII (Count III); and age discrimination,

in violation of the Age Discrimination in Employment Act of 1967, codified, as amended, at 29

U.S.C. §§ 621, *et seq.* (Count IV). ECF 1.

Defendant has filed a pre-discovery motion to dismiss or, alternatively, for summary

judgment. ECF 8. It is supported by a memorandum (ECF 8-2) (collectively, the "Motion") and

multiple exhibits. ECF 8-4 through ECF 8-22; ECF 9-1. Plaintiff opposes the Motion (ECF 16),

and has filed a supporting memorandum (ECF 16-1) (collectively, the "Opposition"). In the

Opposition, plaintiff "voluntarily dismisses" her sex discrimination claim (Count II) and her age

discrimination claim (Count IV). ECF 16-1 at 20. Therefore, only the race discrimination claim

---

[1] Plaintiff's Complaint uses the term "gender" discrimination. *See, e.g.,* ECF 1 at 7.
However, Title VII's text prohibits discrimination on the basis of "sex." *See* 42 U.S.C. § 2000e-
2(a)(1).

(Count I) and the retaliation claim (Count III) remain. Defendant has replied, ECF 21 ("Reply").

Notably, plaintiff has not filed a Rule 56(d) affidavit opposing pre-discovery summary judgment. Rather, plaintiff argues that she has established "a prima facie case of retaliation and discrimination based upon race" and that "there are genuine disputes as to many material facts." ECF 16-1 at 5. Moreover, she relies on evidence submitted by defendant. *See, e.g.,* ECF 16-1 at 3 (citing ECF 8-7 and ECF 8-12).

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105(6). For the reasons that follow, I shall construe defendant's Motion as one for summary judgment and I shall grant the Motion.

## I. Factual Summary

Polastre-Jackson, an "Hispanic female", worked in SSA's Office of Telephone Services ("OTS") during the relevant time. ECF 1, ¶¶ 1, 6; ECF 8-2 at 4. From October 2012 to December 2013, and from February to September 2015, Mark Zarcone, the Supervisory Program Analyst-Center Director, served as plaintiff's direct supervisor. ECF 8-9 (Zarcone Affidavit), ¶¶ 1-2. During the relevant period, Cynthia Bennett was the Acting Associate Commissioner and plaintiff's "second-line supervisor." ECF 8-12 (Bennett Affidavit), ¶ 2. Zarcone and Bennett were aware that plaintiff is Hispanic because they had access to her personnel files and because plaintiff told them. ECF 16-1 at 2; ECF 8-7 (Plaintiff's EEO Investigative Affidavit) at 4.

Prior to July 2015, plaintiff worked in OTS as a Branch Chief Supervisory Program Analyst, at a grade and salary of GS-14. ECF 1, ¶ 10; ECF 8-2 at 4; ECF 8-9, ¶ 2; ECF 8-12, ¶¶ 15-17. She was responsible, *inter alia*, for "analyzing and developing management information requirements and data for telephone service delivery"; providing "technical advice and guidance"

and other "advisory services to various levels of Agency personnel"; developing plans in response to "proposed changes in policies"; and "assign[ing] work to subordinates based on priorities . . . ." *See* ECF 8-14 (Position Description for Branch Chief Supervisory Program Analyst) at 2-3.

Beginning in July 2015, plaintiff worked a four-month detail in the Office of Earnings and International Operations ("OEIO"), where she was a Program Analyst. ECF 8-12, ¶¶ 12-13. Although she was a Program Analyst, rather than a Branch Chief Supervisory Program Analyst, her GS-14 grade remained unchanged. *Id.*

On October 27, 2015, plaintiff and Bennett spoke about plaintiff's anticipated position following the OEIO detail. ECF 8-12, ¶ 17. Bennett told plaintiff she would be assigned to the office of the new Associate Commissioner and would report to Yvette Farmer, the Acting Deputy Associate Commissioner. *Id.* Plaintiff's title was to be that of Program Analyst, and she was to have the responsibilities of assisting Farmer "in preparing and coordinating confidential reports and briefing materials, and to lead a variety of high-level projects." *Id.* As Program Analyst, plaintiff would also "assist the Senior Customer Contact Officer, Jay Garret, on high-level projects." *Id.* These projects included, *id.* ¶ 20:

- Tele-Service Center Space Actions
- IRS/SSA Collaboration Activities
- Customer Service Representative Allocation Strategies
- Average Wait Time (ASA) Research Paper
- Deaf and Hard of Hearing Video Service Pilot

Bennett believed plaintiff's reassignment was consistent with the SSA Personnel Policy Manual (the "Manual"). *Id.* ¶¶ 22-23. Specifically, Section 4.1 of the Manual explains that a "detailed employee is expected to return to his/her regular duties and/or duty station at the end of the detail." ECF 8-18 at 2. According to Bennett, plaintiff "was returned to her duty station

(OTS) at the end of the detail." ECF 8-12, ¶ 22. Additionally, Bennett claims that she followed Section 5.6.1 of the Manual (*id.* ¶ 23), which states: "Management may direct the reassignment of employees to vacant continuing positions for which the employees qualify . . . ." ECF 8-19 (Personnel Policy Manual) at 3.

Moreover, Bennett maintains that she followed Section 5.6.2 of the Manual (ECF 8-12, ¶ 23), which requires that a "decision to direct a reassignment must be bona fide and based upon legitimate management considerations that promote efficiency of the service. Reassignments may not be made to coerce employees into resigning or retiring." ECF 8-19 at 3. Specifically, Bennett avers that she reassigned plaintiff based on "work load priorities, available resources, and [plaintiff's] analytical skills and experience." ECF 8-12, ¶ 20. Further, Bennett based plaintiff's reassignment on the "immediate need for her strong analytical skills and abilities" in the office of the Deputy Associate Commissioner. *Id.*

On both October 27, 2015, and November 3, 2015, plaintiff asked Bennett to reconsider the reassignment. *Id.* ¶ 21. According to Bennett, Polastre-Jackson claimed that the proposed reassignment was an act of retaliation and she threatened to obtain a lawyer if she was, in fact, reassigned. *Id.* Nonetheless, on November 8, 2015, plaintiff was reassigned as a Program Analyst in the office of the Acting Deputy Associate Commissioner. Her GS-14 grade and salary remained unchanged. ECF 8-13 (Notification of Personnel Action), ¶¶ 7, 15. Plaintiff states that her former Branch Chief Supervisory Program Analyst position was filled by an African American employee. ECF 8-7, ¶ 22.

Approximately four months later, on March 21, 2016, plaintiff was again reassigned, but this time to the position of Acting Branch Chief for the OTS Planning Team ("Acting Branch Chief"). ECF 8-7, ¶¶ 3, 36; ECF 8-12, ¶ 11. Again, plaintiff remained at the GS-14 level. ECF

-4-

8-12, ¶ 11. However, despite the title of Acting Branch Chief, plaintiff complains that her work space was a cubicle instead of an office. ECF 8-7, ¶ 36. And, plaintiff maintains that "all other Branch Chiefs and/or Acting Branch Chiefs" have offices. *Id.* Further, she contends that all "current Branch Chiefs/Acting Branch Chiefs are African-American." *Id.* Moreover, plaintiff suggests that the Acting Branch Chief position is not permanent. *Id.* at ¶ 37.

Plaintiff alleges in her suit that she filed an Equal Employment Opportunity ("EEO") complaint in 2014. ECF 1, ¶ 15. The basis of that complaint, plaintiff asserts, was false and negative information contained in her Performance Assessment and Communications System review ("PACS") for 2014. *Id.* The 2014 EEO complaint was resolved to plaintiff's satisfaction. ECF 8-12, ¶ 9.

On October 29, 2015, plaintiff had a 75-minute meeting with Zarcone about the contents of her 2015 PACS. ECF 8-9, ¶¶ 10, 12. Zarcone was plaintiff's PACS "rating official." *Id.* ¶ 11. On November 16, 2015, eight days after plaintiff's reassignment to Program Analyst in the Office of the Acting Deputy Associate Commissioner, plaintiff received a copy of her 2015 PACS. ECF 8-22 (2015 PACS) at 4; ECF 8-9, ¶ 10. Plaintiff did not dispute its contents. ECF 8-9, ¶¶ 10-13, 19.

According to Zarcone, the purpose of a PACS is to "highlight what the employee did well, and where they can improve." *Id.* ¶ 13. In addition to an employee's overall performance rating, a PACS includes an area for supervisors to write about an employee's "observed behaviors." *Id.* This portion of a PACS is designed to help employees improve their performance to achieve a higher PACS rating in the next performance period. *Id.*

In her 2015 PACS, plaintiff received an overall rating of 4 out of 5, which earned her a "summary appraisal" of "successful contribution." ECF 8-22 at 1; ECF 8-9, ¶ 13. There were

six professional categories in which plaintiff was rated on a scale of 1 through 5, with 5 being the best. ECF 8-22 at 1. Plaintiff received a score of 5 in the categories of participation, achieving business results, and managing performance. *Id.* at 2-3. However, she received a score of 3 in interpersonal skills, demonstrating job knowledge, and demonstrating leadership. *Id.*

In the portion of plaintiff's 2015 PACS for "observed behavior" relating to her "interpersonal skills," Zarcone wrote, *inter alia*, that "it has been difficult to present a point of view or suggestion to [Polastre-Jackson] because [she] become[s] defensive when receiving feedback from peers and or management." *Id.* at 1. Further, Zarcone told plaintiff that "it is important to work through differences with others in an objective and constructive manner in order to achieve results." *Id.* He noted that Polastre-Jackson is "enthusiastic and articulate" but that these qualities are "sometimes lost" when she does not "practice good listening skills or when [she] communicate[s] aggressively at a rapid pace, without thinking through [her] comments or response." *Id.* at 2; *see also* ECF 8-9, ¶¶ 12, 13. Zarcone "encourage[d] Polastre-Jackson to continue [her] growth and success . . . by seeking out appropriate courses to help develop interpersonal skills . . . ." ECF 8-22 at 2; *see also* ECF 8-9, ¶¶ 12, 13.

Before Zarcone completed plaintiff's 2015 PACS, Zarcone had "multiple prior conversations with Ms. Polastre-Jackson regarding what we say and how we say it." ECF 8-9, ¶ 14. For example, during a mid-year review on April 30, 2015, he and plaintiff discussed ways to improve her interpersonal skills. *Id.* Additionally, they discussed critical feedback provided by other OTS Directors about Polastre-Jackson's interpersonal and team-work skills. *Id.* Further, they discussed plaintiff's tendency to "try to over talk the other person" when a difference of opinion arose, and how plaintiff often "continue[d] to argue her point for days." *Id.* ¶ 15.

Moreover, Zarcone had previously instructed plaintiff not to spread rumors that one of

her subordinates, Tiffany Thompson, had been fired from a former position. *Id.* In relation to a separate incident, Zarcone met with Thompson on or around May 4, 2015, to discuss a report Thompson had made against plaintiff about a confrontational meeting in which plaintiff criticized Thompson's office communications with Zarcone. *Id.* And, Bennett states that she and plaintiff discussed how plaintiff's subordinates expressed concern about plaintiff's management style and how plaintiff "tried to turn them against" Zarcone, who also supervised them. ECF 8-12, ¶¶ 17, 20, 22.

On April 6, 2016, plaintiff submitted an "EEO Investigative Affidavit" (ECF 8-7), claiming that she "truly believes that [her] prior EEO activity was a contributing factor to the negative and false remarks on . . . [her 2015] PACS," which plaintiff believes were used by Zarcone and Bennett to "justify" removing her from the Branch Chief Supervisory Program Analyst position. *Id.* ¶ 25. Further, plaintiff alleged that Zarcone told her that he was "plotting against" several employees who complained about Zarcone to Bennett. *Id.* Plaintiff asserts that this "made [her] know that Mark Zarcone would retaliate against [her] for [her] prior EEO case against him." *Id.*

Additional facts are included in the Discussion.

## II.     Standard of Review

As noted, defendant has moved to dismiss or, in the alternative, for summary judgment. ECF 8. A motion styled in the alternative, to dismiss or for summary judgment, implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However,

under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But when, as here, the movant expressly captions its motion "in the alternative," as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C ALAN WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448-49; *see Putney v. Likin*, 656 Fed. App'x 632, 638-640 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for

discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's, Inc. v. White Flint Mall, LLLP*, 616 Fed. App'x 552, 561 (4th Cir. 2015).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing the affidavit requirement of former Rule 56(f)). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at her peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961); *see also Dave & Buster's, Inc.*, 616 Fed. App'x at 561. But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always

insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (quoting *Evans*, 80 F.3d at 961). According to the Fourth Circuit, the failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary", and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (quoting *First Chicago Int'l v. United Exchange Co., LTD*, 836 F.2d 1375, 1380-81 (D.C. Cir. 1988)).

As indicated, Polastre-Jackson has not filed an affidavit under Rule 56(d). Nor has she suggested that she would be prejudiced without discovery. Indeed, in her Opposition, plaintiff relies on evidence submitted by defendant, such as plaintiff's EEO Affidavit and the EEO Affidavit of Bennett. *See, e.g.*, ECF 16-1 at 3 (citing ECF 8-7 and ECF 8-12). Moreover, plaintiff has not challenged the exhibits attached to defendant's Motion. Therefore, I am satisfied that it is appropriate to address plaintiff's claims in the context of summary judgment, because this will facilitate disposition of the case.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (May 17, 2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

### III. The Allegations

Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq.*, "prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing or seeking relief from such

-12-

discrimination." *Green v. Brennan*, ___ U.S. ___, 136 S. Ct. 1769, 1773-74 (2016); *see* 42 U.S.C. § 20003-2(a)(1); *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016); *Boyer-Liberto v. Fontainbleu Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 415 (4th Cir. 2015); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014). Moreover, Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Boyer-Liberto*, 786 F.3d at 298. It also prohibits an employer from retaliating against an employee who filed a grievance or complaint regarding an employment practice that allegedly violated Title VII's antidiscrimination provision. *See* 42 U.S.C. § 2000e-3(a); *DeMasters*, 796 F.3d at 415.

Plaintiff asserts that her rights under Title VII were violated because she was demoted twice. Notably, she describes the demotion as follows: (1) when Bennett reassigned her to a Program Analyst position with the Acting Deputy Associate Commissioner, which began on November 8, 2015 (ECF 8-12, ¶ 17; ECF 8-13, ¶¶ 7, 15); and (2) when plaintiff was provided a cubicle, rather than an office, in connection with her reassignment on March 21, 2016, to the position of Acting Branch Chief for the OTS Planning Team. ECF 8-7, ¶¶ 3, 36.

According to Polastre-Jackson, who is Hispanic, Zarcone and Bennett engaged in discrimination based on race by not returning plaintiff to the Branch Chief Supervisory Program Analyst position after her four-month detail as Program Analyst in OEIO. ECF 1, ¶ 10; ECF 8-12, ¶¶ 8, 12-13; ECF 8-2 at 4. Plaintiff points out that her position as Branch Chief Supervisory Program Analyst was filled by an African American employee. ECF 8-7, ¶ 22. Additionally, plaintiff contends that her reassignment to the Program Analyst role was an adverse employment

action because she temporarily lost supervisory responsibilities over other employees, and was merely an assistant to the Acting Deputy Associate Commissioner. ECF 16-1 at 8-9; ECF 8-12, ¶ 19. The record shows that plaintiff assisted the Acting Deputy Associate Commissioner with several assignments. ECF 8-12, ¶¶ 17, 19-20.

Further, plaintiff complains that in her most recent role as Acting Branch Chief for the OTS Planning Team, she was assigned to a cubicle rather than an office. In her view, this constituted an adverse employment action, because all other Branch Chiefs and Acting Branch Chiefs had offices and they were African American. ECF 8-7, ¶ 36.

In addition, plaintiff states that defendant violated Title VII because Zarcone included false and negative statements in plaintiff's 2015 PACS, in retaliation for plaintiff's 2014 EEO activity. ECF 8-7, ¶ 25; ECF 16-1 at 2, 15. According to plaintiff, the statements in her 2015 PACS "partly formed the basis" for her "effective demotion." ECF 8-7, ¶ 25. Plaintiff adds that she knew Zarcone would retaliate against her for her "prior EEO case against him" because he told her that he was "plotting against" other employees who had reported him to Bennett after he told those employees to "listen to him and not [Polastre-Jackson]." *Id.*

## IV. Discussion

### A. Exhaustion

Title VII's prohibitions apply to private sector employees as well as federal employees. *Nielsen v. Hagel*, 666 Fed. App'x 225, 227 (4th Cir. 2016) (citing 42 U.S.C. § 2000e-16(a)).[2] Before filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See*

---

[2] Title VII initially did not protect federal employees. *See* 42 U.S.C. § 2000e(b) (excluding the United States from the definition of "employer"). In 1972, however, Congress amended Title VII to provide that a federal employee who has exhausted her administrative remedies "may file a civil action as provided in section 2000e-5 of this title" against the "head of the department, agency, or unit, as appropriate." 42 U.S.C. § 2000e-16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283-84 (4th Cir. 2012), *cert. denied*, 568 U.S. 882 (2012).

-14-

*Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. General Services Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Maryland Dep't of Transp.*, 662 Fed. App'x 221, 224 (4th Cir. 2016); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300-01 (4th Cir. 2009) (hereinafter, "*Jones*"); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Notably, "[t]he administrative remedies available for federal employees are significantly broader" than those available to employees in the private sector. *Laber v. Harvey*, 438 F.3d 404, 416 (4th Cir. 2006) (en banc). *See* 42 U.S.C. § 2000e-16(c) (setting forth the conditions under which a federal employee may initiate a civil suit under Title VII).

Federal employees "who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult [an EEO] Counselor [in the employee's federal agency] prior to filing [an agency EEO] complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a); *see also Nielsen*, 2016 WL 6695786, at *1; *Young v. Nat'l Ctr. for Health Serv. Research*, 828 F.2d 235, 237 (4th Cir. 1987). Moreover, the employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Nielsen*, 2016 WL 6695786 at *1; *Verrier v. Sebelius*, CCB-09-402, 2010 WL 1222740, at *8 (D. Md. Mar. 23, 2010).

The EEO counselor must "conduct an initial counseling session, during which the counselor must inform the aggrieved party in writing of his rights and responsibilities, and offer the employee the option of pursuing alternative dispute resolution (ADR)." *Nielsen*, 2016 WL 6695786, at *1 (citing 29 C.F.R. §§ 1614.105(b)(1), (2)). Counseling may lead to the withdrawal of the claim or a settlement agreement between the employee and employer. *See* 29 C.F.R. §

1614.504(a); *Campbell v. Geren*, 353 Fed. App'x 879, 882 (4th Cir. 2009). If the employee chooses to pursue ADR, the EEO counselor must conduct a "final interview" within 90 days of the initial interview. 29 C.F.R. §§ 1614.105(d), (f). At the end of the 90 day period, if the matter is not resolved, "the counselor must issue a written notice of right to file a formal complaint within the agency." *Nielson*, 2016 WL 6695786, at *1 (citing 29 C.F.R. § 1614.105(d)-(f)). Thereafter, the aggrieved party must file a formal complaint with the agency within 15 days of receipt of notice from the agency. *See* 29 C.F.R. §§ 1614.105(d), 1614.106(b).[3]

Once the agency takes "final action" on the formal complaint, the aggrieved party may appeal the decision to the EEOC or, within 90 days, file a civil action. *See* 42 U.S.C. § 2000e-16; 29 C.F.R. §§ 1614.110, 1614.401, 1614.407(a); *see also Nielsen*, 2016 WL 6695786 at *1. If an employee appeals to the EEOC, the Office of Federal Operations ("OFO") "reviews the record, supplements it if necessary, and then issues a written decision." *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005) (citing 29 C.F.R. § 1614.404-05). A decision by the OFO is considered to be final, "triggering the right to sue" in court. *Scott*, 409 F.3d at 468 (citing 29 C.F.R. § 1614.405(b)). The employee must initiate the civil lawsuit "[w]ithin 90 days of receipt of the Commission's final decision on an appeal." 29 C.F.R. §§ 1614.407(a), (c). But, if the agency fails to issue a final decision within 180 days of receipt of the formal complaint, or if the EEOC fails to rule within 180 days of the filing, the aggrieved party may also sue. 29 C.F.R. §§ 1615.407(b), (d).

An aggrieved party who fails to comply with the applicable administrative procedures has failed to exhaust her administrative remedies and is generally barred from filing suit. *See, e.g.*, *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013); *Miles v. Dell, Inc.*,

---

[3] Untimely complaints are subject to dismissal, but the 15-day time limit is also subject to "waiver, estoppel, and equitable tolling." 29 C.F.R. § 1614.604(c).

429 F.3d 480, 491 (4th Cir. 2005); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002); *see also Frank v. England*, 313 F. Supp. 2d 532, 536 (D. Md. 2004) ("Before an employee has standing to pursue a claim against a federal employer under Title VII, he must first exhaust the available administrative remedies by proceeding before the agency charged with the discrimination."). In the Fourth Circuit, Title VII's exhaustion requirement functions as a jurisdictional bar where a plaintiff has failed to comply with it. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies." Thus, failure to comply generally mandates dismissal of a suit. *Lorenzo v. Rumsfeld*, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 970 (4th Cir. 1985)).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, it "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas*, 711 F.3d at 407 (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012).

To determine whether a plaintiff has properly alleged a claim that satisfies the exhaustion requirement, courts "may look *only* to the charge filed with that agency." *Balas*, 711 F.3d at 408 (emphasis added). Notably, a court cannot consider matters that were not properly raised during the EEO process. In *Jones*, 551 F.3d 297, 300 (4th Cir. 2009), the Court said: "'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be

maintained in a subsequent Title VII lawsuit.'" (Quoting *Evans*, 80 F.3d at 963); *see also Abdus-Shahid v. Mayor & City Council of Balt.*, 674 Fed. App'x 267, 275-76 (4th Cir. 2017); *Sydnor*, 681 F.3d at 595. Similarly, the Court said in *Evans*, 80 F.3d at 962-63: "The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint." *See also Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation.").

To be sure, courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). But, courts are "not at liberty to read into administrative charges allegations they do not contain." *Id.* Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Id.* at 407-08.

Nevertheless, "an administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit." *Sydnor*, 681 F.3d at 594 (internal citations and quotations omitted). As the *Sydnor* Court said, *id.* at 595: "The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' . . . not precisely the same. . . ." (Citation omitted). *See also McCray*, 662 Fed. App'x at 224; *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 669 (4th Cir. 2015); *Jones*, 551 F.3d at 300; *Evans*, 80 F.3d at 963.

With these principles in mind, I turn to an analysis of exhaustion in the context of this case.

On November 8, 2015, after Polastre-Jackson was detailed as a Program Analyst in the OEIO, she was reassigned as a Program Analyst, working with the Acting Deputy Associate Commissioner. ECF 8-12, ¶¶ 12-13, 17; ECF 8-13, ¶¶ 7, 15. Plaintiff filed her EEO Complaint on February 4, 2016. ECF 8-4. She wrote her complaint by hand on the SSA's "Formal Equal Employment Opportunity (EEO) Complaint of Discrimination" form. ECF 8-4 (the "Form").[4] On March 21, 2016, she was reassigned to the position of Acting Branch Chief, where she was provided with a cubicle as her work space. ECF 8-7, ¶ 36.

On March 26, 2016, and on April 18, 2016, plaintiff's claims were partially dismissed and partially accepted for investigation by the EEO office. ECF 8-5 at 1. In particular, the EEO office accepted for investigation whether the SSA discriminated against plaintiff based on race, and whether defendant retaliated against plaintiff because of her prior EEO activity (1) "when, on November 16, 2015, she was issued her [Final 2015] PACS rating and it contained allegedly negative and false statements"; and (2) "when, on November 9, 2015, she was reassigned and not allowed to return to her Branch Chief position." *Id.*

The SSA issued a Final Agency Decision on October 27, 2016, finding that plaintiff had not been discriminated against or subjected to retaliation in relation to her 2015 PACS or her reassignment on November 9, 2015 as a Program Analyst. ECF 1-5 at 1-2. This suit followed on January 24, 2017.

Plaintiff has exhausted her claims that she was the subject of discrimination based on race. She has also exhausted her claim that she was the subject of retaliation because of negative

_____

[4] The Form contains a section titled "Statement of Claim(s)" (ECF 8-4 at 2), which is where a complainant is supposed to include, *inter alia*, a "brief description of [the] claim." Polastre-Jackson did not complete that portion of the Form. *Id.* Rather, she wrote: "See pages 3-10 hereto of the EEO Counselor Report for this information." *Id.* It does not appear that the parties submitted the Counselor's Report.

and false information in her 2015 PACS, and because of her reassignment on November 9, 2015, as a Program Analyst with the Acting Deputy Associate Commissioner. However, the record does not reflect that plaintiff ever amended her EEO complaint to include a claim of race discrimination or retaliation in relation to her assignment in March 2016 as Acting Branch Chief, or as to her claim regarding the cubicle for a work space, rather than an office.

As part of the EEO's investigation into plaintiff's claims of discrimination, plaintiff filed an "EEO Investigative Affidavit", which was signed by plaintiff on April 6, 2016. *See* ECF 8-7 at 1. In the Affidavit, plaintiff was asked: "Have you since been returned to your Branch Chief Position?" *Id.* at 18, ¶ 36. She responded that she was not returned to her permanent Branch Chief position, but was returned to the Acting Branch Chief position on March 21, 2016. *Id.* at 19. However, she complained that all other Branch Chiefs and Acting Branch Chiefs had offices and are also African American, but she was not provided with an office. *Id.* This contention was not part of the initial complaint submitted to the EEO, however, and no amended complaint was filed. Nor was the allegation part of the EEO investigation (ECF 8-5 at 1), and it was not addressed in the Final Agency Decision. ECF 1-5 at 1-2. Therefore, Polastre-Jackson failed to exhaust her administrative remedies pertaining to any potential Title VII violation concerning the provision of a cubicle in lieu of an office.

Even if, *arguendo*, plaintiff had exhausted the claim, it is unlikely that it would be cognizable under Title VII. This is because the assignment of a cubicle, rather than an office, does not constitute an adverse employment action. *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (noting that an inferior office does not constitute an adverse employment action).

## B. Proof of Discrimination

In general, there are "two avenues" *at trial* by which a plaintiff may prove intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc) (recognized in *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015), as *abrogated on other grounds by Univ. of Texas Sw. Med. Ctr. v. Nassar*, ____ U.S. ____, 133 S. Ct. 2517 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (Mar. 17, 1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Young v. United Parcel Serv., Inc.*, ____ U.S. ____, 135 S. Ct. 1338, 1345 (2015) (construing the Pregnancy Discrimination Act); *Guessous*, 828 F.3d at 216 (discussing the three steps of the *McDonnell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff", who must to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion*

*Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 Fed. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trustees of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the fact-finder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At the summary judgment stage, however, these approaches merely serve to inform a court's evaluation of the allegations. *See Pettis v. Nottoway Cnty. Sch. Bd.*, 592 Fed. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . .").

As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial with regard to retaliation. "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's NC Casino Co.*,

_LLC_, 446 F.3d 541, 551 (4th Cir. 2006)).

## C. Demotion; Retaliation; Adverse Employment Action

In a demotion case, the Fourth Circuit has said that, to establish a prima facie case of discrimination under Title VII, a plaintiff must show: "(1) she is a member of a protected class, (2) she was qualified for her job and her performance was satisfactory, (3) despite her qualifications she was removed from her . . . position and reassigned to a [lesser] position, and (4) the [previous] position remained open to similarly qualified applicants after her reassignment." _Love-Lane v. Martin_, 355 F.3d 766, 787 (4th Cir. 2004); _see also Harris v. Home Sales Co._, 499 Fed. App'x 285, 292 (4th Cir. 2012); _Luqmaan v. Volvo Grp. N. Am., LLC_, 94 F. Supp. 3d 762, 772 (W.D. Va. 2015); _Oguezuonu v. Genesis Health Ventures, Inc._, 415 F. Supp. 2d 577, 584 (D. Md. 2005).

In order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." _Okoli v. City of Balt._, 648 F.3d 216, 223 (4th Cir. 2011) (citations omitted); _see Price v. Thompson_, 380 F.3d 209, 212 (4th Cir. 2004).

As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." _EEOC v. Navy Federal Credit Union_, 424 F.3d 397, 406 (4th Cir. 2005). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." _Laughlin v. Metropolitan Wash. Airports Auth._, 149 F.3d 253, 259 (4th Cir. 1998). "To fall under the protection of the opposition clause . . . behavior need not rise

to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

With respect to the causation element, ordinarily there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

Indeed, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (although a period of nine to ten months between the protected conduct and the adverse action presented "a very close question," the trier of fact could find a causal connection where the defendant declined to hire the plaintiff "at the first available opportunity"). Moreover, "[t]o establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity preceded the adverse action and that the employer knew the employee engaged in a protected activity." *Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) (citing *Causey v. Balog*, 162 F.3d 795, 803-04 (4th Cir. 1998)); *see also Dowe*, 145 F.3d at 657; *cf. Conrad v. CSX Transp.*,

*Inc.*, WMN-13-3730, 2014 WL 7184747, at *4 (D. Md. Dec. 15, 2014), *aff'd*, 824 F.3d 103 (4th Cir. May 25, 2016).

In order to prevail on a discrimination or retaliation claim under Title VII, "the existence of some adverse employment action is required." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Single acts that may not be cognizable as adverse actions on their own may, over time, cumulatively amount to an unlawful employment practice if they create a hostile work environment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Hoyle*, 650 F.3d at 333-34.

In a retaliation claim, the standard for an adverse employment action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted).

However, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. Moreover, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*,

671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).

As to plaintiff's reassignments, the case of *Boone v. Goldin*, 178 F.3d 253, 255-56 (4th Cir. 1999), is instructive. There, the Fourth Circuit explained that a reassignment does not constitute an adverse employment action when the reassignment causes no reduction in compensation, job title, level of responsibility, or opportunity for promotion. *See also James*, 368 F.3d at 376 ("The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action."); *Amirmokri*, 437 F. Supp. 2d at 422-23 ("That Plaintiff may have felt inadequately challenged by his [reassignment] work is not enough to sustain his retaliation claim.").

Even under the "lower bar" applicable to Title VII retaliation claims, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue*, 984 F. Supp. 2d at 492 (internal quotation marks omitted in part) (quoting *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)).

As to any claim based on the 2015 PACS, a poor performance review or reprimand does not constitute an adverse employment action unless it causes "real harm to [the plaintiff's] employment or is an intermediate step to discharge." *Amirmokri*, 437 F. Supp. 2d at 423 (citation omitted); *see also Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) ("Like a reprimand, a poor performance rating does not in itself constitute an adverse employment action. 'Rather, it is a mediate step, which, if relied upon for a true adverse employment action (e.g., discharge, demotion, etc.) becomes relevant evidence.'") (internal citation omitted)

(quoting *Settle v. Balt. Cty.*, 34 F. Supp. 2d 969, 1010 (D. Md. 1999)).

The case of *Amirmokri, supra,* 437 F. Supp. 2d 414, *aff'd,* 266 Fed. App'x 274, is instructive as to Polastre-Jackson's claims based on both the reassignments and the 2015 PACS.[5] There, Amirmokri, an Iranian immigrant, worked as a GS-15 nuclear engineer for the U.S. Department of Energy ("DOE"). 266 Fed. App'x at 275. He filed a Title VII suit against the Secretary of the DOE, alleging discrimination based on national origin and retaliation. *Id.* DOE moved to dismiss or, in the alternative, for summary judgment, which the district court construed as a motion for summary judgment and granted. 437 F. Supp. 2d at 424-25.

While employed by DOE, Amirmokri's supervisors became concerned about his interpersonal skills for several reasons. First, Amirmokri spoke to a colleague in an aggressive, condescending manner when discussing the adequacy of a DOE document. 266 Fed. App'x at 276. Second, he was confrontational and uncooperative with the DOE employee responsible for monitoring entrance into a restricted area of a DOE facility. *Id.* at 276-77. Based on these reports, Amirmokri's supervisor told him to be "'on his best behavior.'" *Id.* at 277 (citation omitted). However, Amirmokri then made threats to sue a colleague for libel when the colleague disagreed about the appropriateness of a DOE safety review procedure. *Id.* Based on these incidents, Amirmokri was sanctioned with a reassignment notice that stripped him of his oversight duties, took away opportunities for direct contact with other DOE facility employees, and directed him to focus on the completion of a document analysis review. *Id.* at 278. Amirmokri also received a letter of reprimand that discussed his "'inappropriate behavior.'" *Id.* at 278-79 (citation omitted).

---

[5] As noted earlier, the Fourth Circuit affirmed the district court in an unpublished, per curiam opinion. Unlike the district court, the Fourth Circuit assumed, without deciding, that Amirmokri's reassignment and letter of reprimand constituted an adverse employment action. Therefore, I shall cite to both opinions.

Amirmokri filed a formal complaint with the DOE, claiming that his reassignment and letter of reprimand constituted discrimination based on national origin and retaliation for an earlier EEO complaint. *Id.* at 279. However, the district court concluded that Amirmokri's reassignment and letter of reprimand did not amount to adverse employment actions. 437 F. Supp. 2d at 422. Concerning Amirmokri's reassignment, the district court stated that reduced responsibilities accompanying Amirmokri's removal from his former Program Manager position did not constitute an adverse employment action because Amirmokri's "subsequent assignment—leading [a] document safety analysis review—entailed substantial responsibility and was commensurate with [his] GS-15 grade." *Id.* The district court stressed that Amirmokri's reassignment involved "'important'" work and was appropriate given his "previous position and experience." For this reason, the district court found that the reassignment "did not constitute a significant decrease in his *level* of responsibility." *Id.* Moreover, the district court underscored that Amirmokri did not lose salary or benefits as a result of the reassignment. *Id.* Therefore, the district court concluded that Amirmokri's reassignment and change in duties did not constitute an adverse employment action. *Id.*

In relation to the letter of reprimand, the district court observed that Amirmokri did not show that it "affected the terms and conditions of his employment, his opportunities for advancement, or any other aspect of his career." *Id.* at 423. For this reason, the district court determined that Amirmokri's letter of reprimand did not constitute an adverse employment action under Title VII. *Id.* at 422-23. Therefore, the district court granted summary judgment in favor of the DOE, and the Fourth Circuit affirmed. 266 Fed. App'x 274.[6]

---

[6] The Fourth Circuit reasoned that, even assuming the actions of DOE qualified as adverse employment actions, Amirmokri could not prevail because he failed to demonstrate that the decision to reprimand him and reassign him "was a mere pretext for discrimination based on

Here, Polastre-Jackson has failed to show an adverse employment action in regard to her race discrimination and retaliation claims or the 2015 PACS.

Prior to July 2015, plaintiff was a GS-14 Branch Chief Supervisory Program Analyst in OTS. ECF 1, ¶ 10; ECF 8-2 at 4; ECF 8-9, ¶ 2; ECF 8-12, ¶¶ 15-17. Beginning in July 2015, plaintiff worked a four-month detail in the OEIO as a GS-14 Program Analyst. ECF 8-12, ¶¶ 12-13. On November 8, 2015, plaintiff was reassigned to the position of Program Analyst in the OTS Office of the Acting Deputy Associate Commissioner. ECF 8-13, ¶¶ 7, 15. On March 21, 2016, plaintiff assumed the position of Acting Branch Chief for the OTS Planning Team, at a level of GS-14. *Id.* ¶¶ 3, 36; ECF 8-12, ¶ 11. Her GS-14 grade never changed. ECF 8-12, ¶ 11.

The fact that the reassignment on November 8, 2015, entailed a removal of plaintiff's supervisory duties and a change in her title does not constitute an adverse employment action. As in *Amirmokri*, 437 F. Supp. 2d at 422-23, 425, plaintiff did not suffer a decrease in salary or benefits as a result of the reassignment. And, plaintiff has not shown that she experienced a decrease in the level of her work responsibilities, below the duties of a GS-14 employee.

In particular, in her prior role as a Branch Chief Supervisory Program Analyst, plaintiff "analyz[ed] and develop[ed] management information requirements and data for telephone service delivery," provided "technical advice and guidance", and "advisory services to various levels of Agency personnel." ECF 8-14 at 2-3. Similarly, in the OTS Program Analyst position, plaintiff "prepar[ed] and coordinat[ed] confidential reports and briefing materials," and was "lead [on] a variety of high-level projects," including "IRS/SSA Collaboration Activities" and "Customer Service Representative Allocation Strategies." ECF 8-12, ¶¶ 17, 20. Even if plaintiff found the OTS Program Analyst position less appealing, this does not constitute an adverse

his national origin or retaliation . . . ." 266 Fed. App'x at 280. This same reasoning was also advanced by the district court. 437 F.Supp. 2d at 423-34.

employment action. *See James*, 368 F.3d at 376; *Amirmokri*, 437 F. Supp. 2d at 422-23.

On November 16, 2015, eight days after the reassignment that took place on November 8, 2015, plaintiff received a copy of her 2015 PACS (ECF 8-22 at 4; ECF 8-9, ¶ 10), in which she obtained a numerical rating of 4 out of 5, with 5 as the best, and a qualitative rating of "successful contribution." ECF 8-22 at 1; ECF 8-9, ¶ 13. In her EEO Affidavit, plaintiff stated that Zarcone and Bennett used her 2015 PACS to "justify" removing her from the Branch Chief Supervisory Program Analyst position. ECF 8-7, ¶ 25. However, the 2015 PACS did not constitute an adverse employment action because it was not a mediate step to a significant change in plaintiff's employment status. *Amirmokri*, 437 F. Supp. 2d at 423; *Jeffers*, 264 F. Supp. 2d at 330; *see also Hoyle*, 650 F.3d at 337; *Wonasue*, 984 F. Supp. 2d at 492 (noting that a formal letter of reprimand does not constitute an adverse employment action in the context of a retaliation claim).

That plaintiff believes her 4 out of 5 rating was lower than she deserved (ECF 1, ¶¶ 57, 82; ECF 16-1 at 3), or that the 2015 PACS contained false and negative information, is of no legal significance. As indicated, plaintiff did not suffer a decrease in salary or benefits as a result of the 2015 PACS. Nor did her job responsibilities decrease below a GS-14 level.

Even assuming that plaintiff established a prima facie case of employment discrimination, the evidence presented readily demonstrates that plaintiff failed to show that the content of her 2015 PACS or her reassignment as Program Analyst with the Acting Deputy Associate Commissioner was a mere pretext for race discrimination or retaliation.

## V.    Conclusion

For the reasons set forth above, I shall grant defendant's Motion for Summary Judgment.

An Order follows.


Date:  December 15, 2017                                              /s/
                                                          Ellen Lipton Hollander
                                                          United States District Judge